UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

STEPHAN H. SLIWA,
individually and on behalf
of all others similarly
situated,

        Plaintiff,

v.                              Case No:  2:16-cv-235-FtM-29MRM


BRIGHT HOUSE NETWORKS, LLC
and ADVANCED TELESOLUTIONS,
INC.,

        Defendants.
_____

## OPINION AND ORDER

This matter comes before the Court on two motions:

Plaintiff's Motion for Class Certification[1] and defendants' Motion

_____

        [1] Plaintiff's [Redacted] Motion for Class Certification (Doc.
#152) was filed on August 10, 2018.  The magistrate judge granted
an unopposed motion allowing plaintiff to file an unredacted but
sealed version of this motion (Doc. #154), and a sealed, unredacted
Motion for Class Certification (Doc. #157) was filed on August 16,
2018.

        Defendants filed a redacted Combined Response in Opposition
(Doc. #161), and with the permission of the Court (Doc. #163) filed
a sealed, unredacted Combined Response in Opposition (Docs. #164,
165) on September 11 and 13, 2018.  With the permission of the
Court (Doc. #168), plaintiff filed a redacted Reply (Doc. #171) on
October 3, 2018, and a sealed, unredacted Reply (Doc. #174) on
October 9, 2018, and defendants filed a redacted Sur-Reply (Doc.
#178) on October 15, 2018, and a sealed, unredacted Sur-Reply
(Docs. #182, 183) on October 18, 2018.

to Exclude Plaintiff's Expert Robert Biggerstaff[2].  The parties have also filed multiple Notices of supplemental authority and responses (Docs. ##198, 208, 210, 211, 221, 234, 235, 236, 239, 242, 243, 244, 246, 255, 258, 262, 263, 266, 270, 271, 272, 273, 277, 279, 280.)  Defendants filed a Request for Oral Argument (Doc. #228), joined in by plaintiff (Doc. #240), and the Court heard oral arguments on May 24, 2019.

For the reasons set forth below, both motions are denied.

**I.**

On January 30, 2017, Plaintiff Stephan H. Sliwa (Plaintiff) filed a five-count Amended Class Action Complaint (Doc. #46) against defendants Bright House Networks, LLC (Bright House) and Advanced Telesolutions, Inc. (ATS) (collectively, Defendants), alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227 et seq. (Counts I and III), the Florida Consumer Collection Practices Act (FCCPA), Fla. Stat. § 559.55 et seq. (Counts II and IV), and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq. (Count V).  The Amended Complaint alleges that Defendants attempted to collect a consumer

---

[2] Defendants' Motion to Exclude Plaintiff's Expert Robert Biggerstaff (Doc. #195) was filed on November 20, 2018, following a redacted version (Doc. #191).  A Response in Opposition (Doc. #201) was filed on December 12, 2018, followed by a sealed version (Doc. #205) filed on December 17, 2018. Defendants' redacted Reply (Doc. #216) and sealed Reply (Doc. #222) followed.

debt of unspecified nature and origin by calling Plaintiff's cellphone without his consent and/or after any consent had been revoked, using an automatic telephone dialing system and/or pre-recorded voice technology. While the Amended Complaint does not say so, the record establishes that Plaintiff received calls intended for a Bright House customer at a telephone number given to Bright House by that customer which had subsequently been re-assigned to Plaintiff's cellphone.

The Court takes the following background facts relevant to class certification from the Amended Complaint and the evidence submitted by the parties[3]:

From 2011 through 2015[4], Bright House provided cable, internet, and phone services to customers in several states under the Bright House brand pursuant to its Residential Subscriber Agreements (RSAs). (Docs. #164, p. 8[5]; #165-1, p. 2.) Under the

---

[3] "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011)(citations and quotations omitted).

[4] In mid-2016 Bright House, Time Warner Cable and Charter Communications combined operations under the "Spectrum" brand. (Doc. #164, p. 8, n.1.)

[5] The page numbering of the documents filed does not always correspond with the page number placed on the top of the document by the Clerk's Office computer at time of filing. If there is a difference, the page number used by the Court will be the number placed on the document by the Clerk's Office computer at the time

RSA, Bright House's customers agreed that Bright House and its vendors could call "the phone numbers . . . suppl[ied] to it for any purpose [via] any method, including an automatic dialing system or an artificial or recorded voice." (Doc. #164, p. 8.) Additionally, Bright House was "entitle[d to] assume that any communications made through [a subscriber's] Services or from the location at which [the subscriber] receive the Services are [the subscriber's] communications or have been authorised by [the subscriber]." (Id., pp. 8-9.) Customers provided telephone numbers to Bright House at various times and in various ways, and should have, but did not always, update any change in their phone numbers. (Id.) Also, the RSA provided for the arbitration of disputes on an individual (non-class) basis, subject to an opt-out right. (Id.)

Bright House asserts that Customer H signed up for its services and provided it with a telephone number ending in "2025" (the 2025 Number) as a home telephone number at which Customer H could be contacted. (Id., pp. 11-12.) In 2014 and 2015, Customer H confirmed the 2025 Number as the accurate contact telephone number. (Id.) Contrary to these assurances, in February 2013, Plaintiff had been assigned the 2025 Number for his cellphone. (Id.)

---

of filing.

The Amended Complaint alleges that on February 1, 2015, Plaintiff began receiving debt-recovery calls from Bright House/ATS at the 2025 Number. (Doc. #46, ¶ 28.) Shortly thereafter, Plaintiff demanded that both Bright House and ATS stop calling his cell phone number. (Id., ¶ 29.) The Amended Complaint states that "Plaintiff expressly revoked any express consent Bright House may have mistakenly believed it had for placement of telephone calls . . . ." (Id., ¶ 30.) Despite revoking consent to receive such calls, "Defendants continued [their] barrage of phone calls to Plaintiff's [] cellular telephone number in an attempt to collect a debt." (Id., ¶ 36.) Either "at least one," or "numerous," or "each" call was made by an automatic telephone dialing system (ATDS). (Id., ¶¶ 37-42.) Plaintiff asserts in the Amended Complaint that each call used a "prerecorded voice" (PRV). (Id., ¶ 43.) Plaintiff states that Defendants called him at least fourteen times after being told they had the wrong number. (Doc. #157, p. 5.)

Plaintiff seeks to certify two nationwide classes, asserting he has satisfied all the requirements for such class certification. Defendants oppose the request for class certification, arguing that: (1) The proposed class definitions are broader than those in the Amended Complaint, are being proposed for the first time after the close of discovery, and are hopelessly vague; (2) there is no feasible administrative way to identify even a fraction of the

members of the proposed classes; (3) there are a host of
individualized inquires which will predominate over any common
questions at trial, including the all-important issue of consent
or lack of consent; (4) Plaintiff has failed to satisfy any of the
remaining requirements of Rule 23 of the Federal Rules of Civil
Procedure for class certification; and (5) Plaintiff and his
counsel are inadequate representatives of the classes in part
because of a conflict of interest created by their engagement
agreement, which prohibits Plaintiff from settling or dismissing
the case against counsel's advice even if in his best interest or
the best interest of the classes. At oral argument, counsel for
Defendants identified fourteen (14) or fifteen (15) grounds they
asserted were each independently sufficient to deny class
certification. (Doc. #260.)

## II.

The Court will first briefly summarize the pertinent legal
principles relating to the TCPA and to class certification.

### A.    The TCPA

Congress passed the Telephone Consumer Protection Act to
balance "[i]ndividuals' privacy rights, public safety interests,
and commercial freedoms of speech and trade." Tel. Consumer Prot.
Act of 1991, Pub. L. No. 102-243, § 2(9) (1991). The TCPA
prohibits "any person . . . [from making] any call (other than a
call made for emergency purposes or made with the prior express

consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii); see also Breslow v. Wells Fargo Bank, N.A., 755 F.3d 1265, 1266 (11th Cir. 2014) (The TCPA "makes it unlawful to make any call using an automatic telephone dialing system (an 'autodial system') to a cellular telephone without the prior express consent of the 'called party.'").

The TCPA also created a private right of action that allows a person to seek an injunction or monetary damages based on a violation of § 227(b) or a regulation promulgated thereunder. 47 U.S.C. § 227(b)(3). For each violation, a plaintiff can recover the greater of their actual monetary loss or $500. 47 U.S.C. § 227(b)(3)(B). Up to treble damages are available if the defendant committed a violation willfully or knowingly. 47 U.S.C. § 227(b)(3)(C); see also Mais v. Gulf Coast Collection Bureau, Inc., 768 F.3d 1110, 1117 (11th Cir. 2014).

"One of the key concepts in § 227(b)(1)(A)(iii) is consent." Schweitzer v. Comenity Bank, 866 F.3d 1273, 1274 (11th Cir. 2017). Consent by the called party is an exception to the general rule that such calls violate the TCPA, and must be established by the caller who asserts consent. Osorio v. State Farm Bank, F.S.B., 746 F.3d 1242, 1253 (11th Cir. 2014)("To fall within § 227(b)(1)(A)(iii)'s consent exception, State Farm must demonstrate

that it had the consent of Osorio, as defined by the common law, to call No. 8626."); *see also* Latner v. Mount Sinai Health Sys., Inc, 879 F.3d 52, 54 (2d Cir. 2018)("Prior express consent is an affirmative defense to liability under the TCPA."); Daubert v. NRA Group, LLC, 861 F.3d 382, 390 (3d Cir. 2017)("As the party claiming Daubert's 'prior express consent' NRA would've been required to prove it at trial."); Blow v. Bijora, Inc., 855 F.3d 793, 803 (7th Cir. 2017)("Express consent is an affirmative defense on which the defendant bears the burden of proof."); Van Patten v. Vertical Fitness Group, 847 F.3d 1037, 1044 (9th Cir. 2017)("Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof.").

Such "prior express consent" must be given by the "called party." 47 U.S.C. § 227(b)(1)(A)(iii). The "called party" means the subscriber to the cellphone service, not the intended recipient of the call. Osorio*,* 746 F.3d at 1251-52; Breslow., 755 F.3d at 1267. "Prior express consent" is not defined in the TCPA statute, but has been discussed by the Federal Communications Commission (FCC) in its regulations. See e.g. In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 7 F.C.C. Rcd. 8752, 8769 (1992); In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 23 F.C.C. Rcd. 559, 564 (2008). In 2014, the FCC clarified that "the scope of [an individual's

prior express] consent must be determined upon the facts of each situation." _Matter of GroupMe, Inc./Skype Commc'ns S.A.R.L Petition for Expedited Declaratory Ruling Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991_, 29 F.C.C. Rcd. 3442, 3446 (2014).

> No specific method is required under the TCPA for a caller to obtain prior consent to place automated calls or to subsequently revoke that consent. _In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2015 FCC Ruling)_, 30 FCC Rcd. 7961, 7990. Accordingly, we recently concluded that "Congress sought to incorporate 'the common law concept of consent'" into the TCPA."

_Lawrence v. Bayview Loan Servicing, LLC_, 666 F. App'x 875, 879 (11th Cir. 2016)(citing _Osorio_, 746 F.3d at 1256).  In the Eleventh Circuit, consent may be orally revoked, _Osorio_, 746 F.3d at 1255, and may be partially revoked.  _Schweitzer_, 866 F.3d at 1274.  "The requirement of 'willful[ ] or knowing[ ]' conduct requires the violator to know he was performing the conduct that violates the statute."  _Lary v. Trinity Physician Fin. & Ins. Services_, 780 F.3d 1101, 1107 (11th Cir. 2015).

**B.    Class Certification Principles**

The Eleventh Circuit has summarized the relevant law governing class certification as follows:

> Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is "adequately defined and clearly ascertainable." _DeBremaecker v. Short_, 433 F.2d 733, 734 (5th Cir. 1970)1; _cf._ _John v. Nat'l Sec. Fire & Cas. Co._, 501 F.3d

443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23.").

 If the plaintiff's proposed class is adequately defined and clearly ascertainable, the plaintiff must then establish the four requirements listed in Federal Rule of Civil Procedure 23(a). Those requirements are:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Those four requirements are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation." See, e.g., Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1188 (11th Cir. 2003).

In addition to establishing the Rule 23(a) requirements, a plaintiff must also establish that the proposed class satisfies at least one of the three requirements listed in Rule 23(b). Fed. R. Civ. P. 23(b); Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1279 (11th Cir. 2000). In this case, the plaintiffs are pursuing certification under the third alternative requirement, Rule 23(b)(3). Rule 23(b)(3) permits class certification if "the court finds that the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added); see Fitzpatrick v. Gen. Mills, Inc., 635 F.3d 1279, 1282 (11th Cir. 2011).

<u>Little v. T-Mobile USA, Inc.</u>, 691 F.3d 1302, 1304 (11th Cir. 2012);

<u>see also</u> <u>Carriuolo v. Gen. Motors Co.</u>, 823 F.3d 977, 984 (11th

Cir. 2016).

> Additionally,
>
> [t]he party seeking class certification has the burden
> of proof. And the entire point of a burden of proof is
> that, if doubts remain about whether the standard is
> satisfied, the party with the burden of proof loses. All
> else being equal, the presumption is against class
> certification because class actions are an exception to
> our constitutional tradition of individual litigation.
> A district court that has doubts about whether the
> requirements of Rule 23 have been met should refuse
> certification until they have been met.

<u>Brown v. Electrolux Home Products, Inc.</u>, 817 F.3d 1225, 1233-34

(11th Cir. 2016)(internal punctuation and citations omitted).

Thus, a plaintiff seeking class certification

> must affirmatively demonstrate his compliance with Rule
> 23 by proving that the requirements are in fact
> satisfied. And the district court must conduct a
> rigorous analysis to determine whether the movant
> carried his burden, which will frequently entail overlap
> with the merits of the plaintiff's underlying claim. Of
> course, the district court can consider the merits only
> to the extent they are relevant to determining whether
> the Rule 23 prerequisites for class certification are
> satisfied. But if a question of fact or law is relevant
> to that determination, then the district court has a
> duty to actually decide it and not accept it as true or
> construe it in anyone's favor.

> <u>Id.</u> (internal punctuation and citations omitted).

**III.**

The context of this case is summarized as follows:

> While there is no consensus about the exact numbers of reassignments, there is no dispute that millions of wireless numbers are reassigned each year. In the event of a reassignment, the caller might initiate a phone call (or send a text message) based on a mistaken belief that the owner of the receiving number has given consent, when in fact the number has been reassigned to someone else from whom consent has not been obtained.
>
> Does a call or message in that situation violate the statutory bar against making autodialer calls without prior consent?

ACA Int'l v. Fed. Communications Comm'n, 885 F.3d 687, 705 (D.C. Cir. 2018).

The Court addresses Plaintiff's evidence regarding each requirement for class certification, and Defendants' objections, in turn.

**A.     Adequately Defined Classes**

Plaintiff seeks to certify the following two classes in connection with the two TCPA counts:[6]

ATDS Class

(1) All persons in the United States (2) who are not a customer of either defendant (3) to whose cellular telephone number [4] Defendants placed at least one non-emergency telephone call [5] using substantially the same dialing system(s) they used to telephone Plaintiff [6] within the 4 year period preceding the filing of the

---

[6] At oral argument, Plaintiff's counsel stated that if the TCPA classes are certified, the remaining counts under the FCCPA and the FDCPA would continue in the case as individual claims by plaintiff Sliwa.

complaint [7] after Defendants had already documented the number as a wrong number in their records

Prerecorded Voice Class

(1) All persons in the United States (2) who are not a customer of either defendant (3) to whose cellular telephone number [4] Defendants placed at least one non-emergency telephone call [5] using a prerecorded voice [6] within the 4 year period preceding the filing of the complaint [7] after Defendants had already documented the number as a wrong number in their records.

(Doc. #157, pp. 8-9.)[7] Only element (5) is different for the two proposed classes.

For a class to be certified, the Eleventh Circuit requires that the proposed class be "adequately defined." Little, 691 F.3d at 1303; Karhu v. Vital Pharm., Inc., 621 F. App'x 945, 946 (11th Cir. 2015)(citation and quotation omitted). A proposed class is adequately defined when the class definition contains objective criteria which allow for the identification of class members. Karhu, 621 F. App'x at 946; City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d 434, 441 (3d Cir. 2017). Plaintiff asserts that each class is adequately defined because each element is defined by objective criteria. (Doc. #157, p. 12.) Defendants see the matter quite differently, asserting there are a host of problems with these proposed class definitions. (Doc. #164, pp. 15-21.) The Court will address Defendants' objections below.

---

[7] Each of the proposed class definitions used "(3)" twice, so the Court has renumbered the remaining components of each definition.

**(1)  Changed Scope of Proposed Classes**

Defendants argue that the proposed class definitions are broader than those set forth in the Amended Complaint, therefore rendering class certification inappropriate.  Defendants assert that Plaintiff's initial classes only included persons who had not consented to being called, while the new classes include all persons who may be tied to a "wrong number" notation in any of Defendants' records, regardless of whether Defendants had consent. (Doc. #164, pp. 15-16.)  In their written materials submitted at oral argument (Doc. #260), Defendants also complained that the proposed classes violate the due process rights of others because the current proposed classes exclude persons who had been in the original proposed classes.

Plaintiff argues that even after discovery "there is no evidence of consent for any of the numbers in the class."  (Doc. #157, p. 11.)  Additionally, Plaintiff replies that the proposed classes are not broader than those set forth in the Amended Complaint, but are actually narrower.  Plaintiff asserts that he simplified the definitions to include only non-customers who, by definition, did not consent.  (Doc. #174, pp. 1-2.)

In order to give rise to a claim under the TCPA, a call must have been made "using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. §

227(b)(1)(A)(iii).  As discussed earlier, the lack of "prior express consent of the called party" is an affirmative defense to a TCPA claim, and therefore need not be negated in the complaint.[8] La Grasta v. First Union Sec., Inc., 358 F.3d 840, 845 (11th Cir. 2004).

The original proposed classes in the Amended Complaint included all persons in the United States to whose cellular telephone number Defendants placed a non-emergency telephone call "using substantially the same system(s) that were used to telephone Plaintiff" where Bright House or ATS "did not have express consent to call said cellular telephone number."  (Doc. #46, ¶¶ 88-89.) A proposed sub-class consisted of persons receiving such calls "after that person had instructed Bright House [or ATS] to cease calls to that number."  (Doc. #46, ¶¶ 88, 89.)  The Court concludes that while the language defining the proposed classes in the Amended Complaint is different from the language currently proposed, the differences are not so significant as to require denial of class certification.

**(2)  New Prerecorded Voice Class**

Defendants also assert that Plaintiff never before proposed a class tied to the use of a prerecorded voice, since the classes set forth in the Amended Complaint only related to the automatic

---

[8] As discussed later, consent or the lack of it is a material issue for some of the Rule 23 requirements.

dialing system.   (Doc. #164, p. 15.)   According to Defendants, this new class must be disallowed.   Plaintiff responds that discovery has established that all the calls at issue were made by ATS using a single calling system, the Aspect Unified IP dialer. This dialing system placed some prerecorded calls and some calls that were not prerecorded.   Therefore, Plaintiff argues, all members of the Prerecorded Voice Class will be members of the ATDS class. (Doc. #174, pp. 1-2.)

The "systems" used to telephone Plaintiff are consistently described in the Amended Complaint as including prerecorded calls. (Doc. #46, ¶¶ 4, 6, 30, 43, 53, 55, 59, 60, 61, 70, 71, 72.)   Thus, the proposed prerecorded voice class is not so different from the original proposed classes that certification must be denied on that basis alone.

**(3)  Changes to Class Definitions After Close of Discovery**

Defendants assert that the timing of the amended proposed classes - after the close of discovery - renders certification of such classes a violation of due process.[9]   (Doc. #164, p. 16.) The Court concludes that none of the proposed changes will substantially change the contours of the classes or unduly prejudice Defendants and therefore would not violate due process.

---

[9] Defendants actually argue that this type of tactic is a "type of switcheroo."   (Doc. #164, p. 16.)   The Court loosely translates that to be a due process issue.

**(4) Vague Terminology**

Defendants argue that the proposed classes are so vaguely worded that it is difficult to tell who Plaintiff intends to include in the classes. (Doc. #164, pp. 4-5, 17-18.) Plaintiff disagrees, as does the Court.

Defendants assert that element (2) is vague because they cannot tell who qualifies as a "customer" in the phrase "not a customer" of either defendant. The declarations submitted on Defendants' behalf by David W. Zitko, Scott Van Nest, and Ryan D. Watstein (Docs. ##165-1, 165-3, 165-5) demonstrate no difficulty in understanding the concept of "customer." The Court rejects Defendants' argument that the term "customer" is unduly vague.

As to element (3), Defendants argue that the phrase "to whose cellular telephone number" Defendants called is vague because it fails to explain whether this includes persons who were the cellular subscribers, or the customary users of the cellphone, or both. This is important, Defendants assert, because non-subscriber customary users may consent to receive calls, consent is a complete defense to TCPA liability, and it is impossible to identify non-subscriber customary users in any feasible way. (Doc. #164, p. 17.)

Plaintiff replies that the class definition includes only persons who were the subscribers of the cellphone, since a subscriber has the cause of action, even if it was someone other

than the subscriber who answered a call.  (Doc. #174, p. 3.)  This position further agitates Defendants, who complain that it is yet another amendment to the proposed classes made long after the close of discovery.  (Doc. #182, p. 3.)

The Court agrees that the "whose" in the phrase "to whose cellular telephone number" reasonably refers only to the subscriber of that cellular telephone number.  This comports with the law in the Eleventh Circuit that a "called party" for purposes of § 227(b)(1)(A)(iii) means the subscriber to the cellphone service, not the intended recipient.  Osorio, 746 F.3d at 1251-52; Breslow, 755 F.3d at 1267.  This construction causes no prejudice to Defendants since it has been the law in the Eleventh Circuit since 2014, and is a narrower definition than at least one circuit would allow.  See Leyse v. Bank of Am. Nat. Ass'n, 804 F.3d 316, 325 n.13 (3d Cir. 2015);  see also Soppet v. Enhanced Recovery Co., LLC, 679 F.3d 637, 643 (7th Cir. 2012)("We conclude that 'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made.").

Defendants argue that element (7) ties class membership to records which "document the [cellular phone] number as a wrong number," but does not specify what records those may be, which defendant holds the records, and what type of entry would document a wrong number.  (Doc. #164, pp. 14-15.)  Defendants assert this

makes it unclear as to which cell phone numbers fall within the class definitions. (Id., p. 17.)

The Court finds that the class definitions do not need to define which records are being utilized. The operative fact is the existence of such documentation in the records, not the identity of the record in which the documentation is contained.

Finally, Defendants' due process and Rule 23 notice arguments contain no small amount of irony. Defendants argue that there should be no members of any class, yet complain that Plaintiff's definitions would violate due process and/or Rule 23 by excluding some persons who would have been potential members of his original proposed classes. In any event, Defendants' objection is not well founded. While there is a statute of limitations benefit[10], an asserted member of a proposed class does not have a vested right in a certified class, and the person suffers no due process violation if not included in the ultimate class which is certified.

---

[10] In American Pipe & Construction Co. v. Utah, 414 U.S. 538, 554 (1974), the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." In Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 353-54 (1983), the Supreme Court extended American Pipe tolling to would-be class members who filed separate actions after the denial of class certification.

The Court will restate the proposed class definitions as follows:

ATDS Class

(1) All persons in the United States (2) who are not a customer of either defendant (3) who subscribed to a cellular telephone number (4) to which Defendants placed at least one non-emergency telephone call (5) using an Aspect Unified IP dialer system[11] (6) within the 4 year period preceding January 30, 2017[12] (7) after Defendants had already documented the number as a wrong number in their records.

Prerecorded Voice Class

(1) All persons in the United States (2) who are not a customer of either defendant (3) who subscribed to a cellular telephone number (4) to which Defendants placed at least one non-emergency telephone call (5) using a prerecorded voice (6) within the 4 year period preceding January 30, 2017 (7) after Defendants had already documented the number as a wrong number in their records.

**B.    Clearly Ascertainable Class**

In addition to an "adequately defined" class, the Eleventh Circuit requires the class to be "clearly ascertainable." <u>Little</u>, 691 F.3d at 1303; <u>Carriuolo</u>, 823 F.3d at 984; <u>see also</u> <u>Bussey v. Macon Cty. Greyhound Park, Inc.</u>, 562 F. App'x 782, 787 (11th Cir. 2014). In an unpublished order declining to grant leave for an interlocutory appeal, the Eleventh Circuit has recently noted:

---

[11] Plaintiff asserts that discovery has established that all the calls at issue were made by ATS using an Aspect Unified IP dialer. (Doc. #157, p. 4 n. 2.)

[12] The Amended Complaint which first contained class allegations was filed on January 30, 2017.

"Our sister circuits are split over whether this means a plaintiff must demonstrate an 'administratively feasible' method for determining class membership over and above Rule 23's express requirements." Ocwen Loan Servicing, LLC v. Belcher, 18-90011, 2018 WL 3198552, at *3 (11th Cir. June 29, 2018) (citations omitted). In unpublished opinions, the Eleventh Circuit had previously found that to satisfy the ascertainability requirement, a plaintiff "must propose an administratively feasible method by which class members can be identified," Karhu, 621 F. App'x at 947, and that "[i]dentifying class members is administratively feasible when it is a 'manageable process that does not require much, if any, individual inquiry.'" Bussey, 562 F. App'x at 787 (citation omitted).[13]

> A Rule 23(b)(3) class must also be currently and readily ascertainable based on objective criteria. To satisfy this standard, plaintiff must show that (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.

City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc., 867 F.3d 434, 439 (3d Cir. 2017).

Plaintiff argues that the Court should not follow the definition of "an administratively feasible method by which class

---

[13] Other circuits continue to limit the requirements to those expressly stated in Rule 23. See e.g. True Health Chiropractic Inc. v. McKesseon Corp., 896 F. 3d 923, 929 (9th Cir. 2018).

members can be identified" as set forth in <u>Karhu</u> and <u>Bussey</u> because they are unpublished opinions and their heightened standard has not been adopted by the Eleventh Circuit in a published opinion. Nonetheless, Plaintiff asserts that his proposed class members are clearly ascertainable under this standard. (Docs. #157, pp. 8-9; #174, pp. 2-5.)

The Court is not bound by <u>Karhu</u> or <u>Bussey</u>. <u>See</u> 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."). Requiring a "manageable process that does not require much, if any, individual inquiry" gives a district court substantial flexibility to consider the facts of a particular case and tailor the administrative process to the unique needs of the case. <u>Bussey</u>, 562 F. App'x at 787. Afterall, courts do not normally consider cases for which there is no feasible method of identifying a party or affording judicial relief. Thus, in determining the requirement that the class be "clearly ascertainable," some reasonable level of administrative feasibility is necessary. Whether this is a separate, free-standing requirement or is embedded in the Rule 23 requirements makes no meaningful difference in this case, since the result is the same.

In a nutshell, Plaintiff seeks to represent classes of non-customers who received autodialed or prerecorded calls on cellular telephones for which they were the subscriber after Defendants had

documented in their records that the cellphone number was the wrong number for the customer Defendants were trying to reach. The Court considers below whether there is a manageable process for determining who such people are.

The basic facts are not disputed. If a Bright House customer failed to make a timely payment, Bright House would call the customer and "remind the customer to make a payment to avoid a service interruption." (Doc. #164, p. 9.) On April 20, 2012, Bright House entered into a contract with ATS to make debt collection calls on its behalf. (Doc. #157, p. 4.) Bright House continued to make calls as well, although Plaintiff represents that all of the calls at issue in this case were made by ATS. (Id., p. 2.)

If a balance remained unpaid after Bright House called the customer, ATS would call the customer on Bright House's behalf and remind the customer to make a payment to avoid service interruption and late fees. (Doc. #165-1, p. 5.) After an ATS agent made such a call, the ATS agent was required to select one (and only one) of approximately twenty disposition codes to describe the phone call. (Docs. #164, p. 9; #165-5, p. 3.) The disposition code would then be translated into a "result code," the "result code" would be entered into a report log, and the report log would be sent to Bright House. (Id.) One such "disposition code" was "Bad Phone" (the BP Code) and one such "result code" was "Incorrect Number-

Live Answer." (Doc. #164, p. 10.) Additionally, if an ATS agent called an incorrect number, ATS was to email Bright House and inform Bright House of the incorrect number so Bright House could remove that number from the customer's account. (Doc. #164, pp. 9, 11-12, n.2, 3.) Defendants assert that due to their document retention policies there are no such emails in existence. (Id., p. 12, n.3.)

**(1)   Plaintiff's Process to Identify Class Members**

Plaintiff asserts that he has devised an administrative process through which his proposed class members can be clearly ascertained. Plaintiff asserts that through discovery and use of an expert, he has prepared a list of over 9,000 telephone numbers of non-customers who received calls from Defendants after the cellphone numbers had already been determined by Defendants to be a wrong number. This assertion is hotly contested by Defendants.

Plaintiff's expert, Robert Biggerstaff, developed criteria and a process which he asserts will "identify calls where ATDS calls and prerecorded messages were made to cell phones after a record documenting an event consistent with a wrong number and/or a request to stop calling . . . ." (Doc. #157-1, p. 15.) The identification of such calls, Mr. Biggerstaff asserts, is "to a high degree of scientific certainty" and made "to a reasonable degree of scientific certainly [sic]." (Id.)

Mr. Biggerstaff obtained the telephone numbers called by Defendants during the relevant time period from Defendants, and identified which numbers were assigned to cell phones through a process which has not been challenged. (Doc. #157-1, pp. 13-14.) This resulted in a list of cell phone numbers called by Defendants. In an effort to cull out calls to customers (who presumably had consented to such calls through the RSA), Mr. Biggerstaff matched each cell number with the ATS record and the Bright House record corresponding to that number, resulting in an "account/phone tuple." (Id., p. 7.) Looking at the codes used by ATS to characterize each call, Mr. Biggerstaff found a "Bad Phone" code. Mr. Biggerstaff recognized this as ineffectual by itself because the "Bad Phone" notation by ATS resulted in at least nine different outcomes in the Bright House records, not all of which were consistent with a wrong number. (Doc. #157-1, p. 8.) Mr. Biggerstaff therefore used the single Bright House code "Incorrect Number-Live Answer," with the BP Code calls. (Id., p. 9.) Mr. Biggerstaff then utilized a "kill list" which excluded numbers based upon certain events which suggested the number was associated with a customer.[14] (Id., pp. 8-9.)

---

[14] The expert excluded any cell number which, according to Defendants' records, had ever been involved in discussions of payment arrangements, since this would indicate the possibility of a customer (who else would discuss payments?). (Doc. #157-1, p. 9.)

This process resulted in Group A, a list of autodialed and prerecorded voice calls made to cell phone numbers after ATS coded the number as "Bad Phone" and Bright House coded the number as "Incorrect Number-Live Answer." (Id., p. 9.) The list contained 9,406 cell phone numbers, which were called 47,762 times using an ATDS after both Defendants had coded the numbers as set forth above. (Id.) Of these, 46,065 involved prerecorded voice messages. (Doc. #157, pp. 7-8.) To identify the people associated with these numbers, Mr. Biggerstaff proposes to obtain subscriber information from the telephone carriers for those numbers. (Doc. #157-1, pp. 14-15.)

While Plaintiff asserts this list alone is sufficient, Plaintiff also suggests that class members can be "double verified" by requiring any class claimant to file an affidavit confirming they were not a customer of either defendant. Once the names and addresses are obtained, Plaintiff will provide written notice to the putative class members. (Doc. #157, p. 18; Doc. #174, pp. 2-6.)

Defendants assert that this does not satisfy the clearly ascertainable standard because: (1) the list itself is insufficient; (2) Plaintiff is unable to serve new subpoenas on the cell phone providers because the discovery period in the case is over; (3) such a procedure would be expensive, time-consuming and immensely difficult; (4) the Cable Communications Policy Act

of 1984 requires customer consent before Bright House could permit customer phone numbers to be sent to wireless carriers; and (5) such a procedure would be unsuccessful because it is unable to verify the identity of the user or subscriber of a particular number at a particular time.  (Doc. #164, pp. 18-21.)

The primary stumbling blocks, according to Defendants, are determining which of the called numbers were "wrong" (i.e., were not customers), whether numbers documented as wrong numbers were actually wrong (i.e., the documentation was based on true or false information); and for such actual wrong numbers, determining the identity of the class members.

### (2)    Identification of Wrong Numbers

The first issue is to determine which called numbers were "wrong", i.e., numbers for someone other than a customer or user who had given consent.  Plaintiff's list of "wrong" numbers is premised on the idea that numbers with the BP Code are wrong numbers.  Defendants argue that the BP Code does not mean ATS called a wrong number.  Rather, Defendants contend, the BP Code appeared in the records in many scenarios and therefore does not necessarily mean a wrong number was called.  (Doc. #164, pp. 13-14.)

Plaintiff argues that his proposed classes are "narrowly tailored," and are thus clearly ascertainable, because Scott Van

Nest (Van Nest)[15] testified at deposition that BP Codes were assigned to individuals called at the wrong number. (Doc. #174, p. 8.) When Van Nest was prompted at deposition to give "some examples" of codes associated with a call to an incorrect number, Van Nest testified that "[t]here's a number of dispositions that [] might have [been] used," and then identified the BP Code as such an example. (Doc. #157-4, pp. 5-6.) Contrary to Plaintiff's position, Van Nest did not testify that calling a wrong number was the exclusive reason a BP Code was assigned to that number. Indeed, Van Nest has identified other reasons a number may be assigned a BP Code: when the "recipient reported that the customer could be more easily reached at a different number"; when the "recipient stated that the customer did not want to receive calls at that exact time"; or when "the recipient was rude or evasive." (Doc. #165-3, pp. 4-5.)

Because the BP Code assigned to a phone number does not in and of itself mean or establish that Defendants dialed a wrong number, determining whether Defendants called a particular phone number after they "had already documented the number as a wrong number in their records" would require individualized inquiries as to why each phone number was assigned a BP Code. (Doc. #157, pp.

---

[15] Scott Van Nest is the "Director of Call Center Technology for ETAN Industries, which owns and manages the day-to-day functions of Advanced Telesolutions, Inc." (Doc. #165-3, p. 2.)

8-9.)  Indeed, when presented with similar evidence regarding "wrong number" call log designations, this Court recognized that "in the debt collection industry 'wrong number' oftentimes does not mean non-consent because many customers tell agents they have reached the wrong number, though the correct number was called, as a way to avoid further debt collection."  Tillman v. Ally Fin. Inc., No. 2:16-CV-313-FTM-99CM, 2017 WL 7194275, at *7 (M.D. Fla. Sept. 29, 2017).  The difficulty in ascertaining this information is compounded by the fact that the phone numbers at issue were initially provided to Bright House by consenting customers.

**(3)  Double Verification**

Plaintiff's contention that class membership can be "double verif[ied]" by affidavits from each class member (Doc. #157, p. 18) heightens rather than precludes the case-by-case analysis required as to each BP Code designation.  Such "self-identification-based ascertainment [is] intertwined" with due process concerns and will necessarily require significant individualized inquiries.  Karhu, 621 F. App'x at 948-49 ("[P]rotecting defendants' due-process rights by allowing them to challenge each claimant's class membership is administratively infeasible, because it requires a series of mini-trials just to

evaluate the threshold issue of which [persons] are class members."
(citation and quotation omitted)).[16]

Because identifying the members of Plaintiff's proposed classes would require significant individualized inquiries, Plaintiff has not proposed an administratively feasible method for identifying the classes, and Plaintiff has thus failed to carry his burden of establishing ascertainability.[17]   Karhu, 621 F. App'x

---

[16] In arguing that his method for identifying class members is administratively feasible, Plaintiff heavily relies upon cases where defendants sent unsolicited fax advertisements to plaintiffs in violation of the TCPA.   See e.g. Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc., 821 F.3d 992 (8th Cir. 2016); Palm Beach Golf Ctr.-Boca, Inc. v. Sarris, 311 F.R.D. 688 (S.D. Fla. 2015); Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC, No. 12-22330-CIV, 2014 WL 7366255, at *1 (S.D. Fla. Dec. 24, 2014). While the courts in those cases did certify the proposed classes based upon a list of phone numbers to which the defendants sent unsolicited faxes, the courts in those TCPA fax cases were not faced with the same individualized issues present in this case. Unlike this case, those cases do not involve the interpretation of "wrong number" call log designations, nor do they involve the issues surrounding consent and arbitration discussed *infra*.   The Court therefore finds these authorities inapposite.

[17] The Court finds Plaintiff's reliance on Reyes v. BCA Fin. Servs., Inc., No. 16-24077-CIV, 2018 WL 3145807, at *13-*14 (S.D. Fla. June 26, 2018) unpersuasive. There, the court found that the plaintiff's proposed method of identifying class members by using the defendant's "wrong number" call log records was administratively feasible because it was a "*starting point*" from which the plaintiff could "further define the class . . . [with] the use of self-identifying affidavits and subpoenas." Id., at *13 (emphasis in original).   In this case, while Plaintiff's proposed method of using Defendants' records to identify class members is similarly a "starting point" for identifying the classes, it is nonetheless a "starting point" rife with individualized inquiries that make the method administratively infeasible for the reasons discussed *supra*.

at 947. Although the Court finds Plaintiff failed to establish ascertainability, thus rendering class certification inappropriate, the Court will nonetheless discuss the express Rule 23 requirements below.

**C.    Express Rule 23(a) Requirements**

Plaintiff asserts that he has established all of the Rule 23 requirements, while Defendants assert that Plaintiff has established none of them. As noted above, Plaintiff must establish that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Additionally, Plaintiff seeks to satisfy Rule 23(b)(3), which requires that he establish that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**(1)  Numerosity**

Plaintiff may utilize a class action suit "only if: (1) the class is so numerous that joinder of all members is impracticable . . . ." Fed. R. Civ. P. 23(a)(1). "Although mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class." Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 930 (11th Cir. 1983). "Nevertheless, a plaintiff still bears the burden of making some showing, affording the district court the means to make a supported factual finding, that the class actually certified meets the numerosity requirement." Vega, 564 F.3d at 1267.

Plaintiff asserts that discovery in the case established that Defendants used an ATDS to call 9,406 unique cellular telephone numbers belonging to non-customers 47,762 times after Defendants' records coded the number as a wrong number.  46,065 of those calls used a prerecorded voice.  Plaintiff argues that this satisfies the numerosity requirement.  (Doc. #157, pp. 3, 6-8, 11-12.) Defendants, however, assert that Plaintiff has failed to show numerosity because there is no evidence that any of the subscribers or users of the phone numbers in Group A are non-customers of Bright House.  (Doc. #164, p. 39.)   Thus, Defendants argue, it has not been shown there are any class members.  (Doc. #174, pp. 12-13.)

The Court agrees that Plaintiff has failed to carry his burden of establishing numerosity. Although Plaintiff presumes that the list of 9,406 cell phone numbers identified in Mr. Biggerstaff's report belong to non-customers, Plaintiff has failed to establish that any of the cell phone numbers on that list *actually* belong to non-customers. As discussed *supra*, the difficulty in inferring numerosity based upon the Biggerstaff report alone is compounded by the fact that the phone numbers listed in Group A of the report were provided to Bright House by Bright House customers. Indeed, Biggerstaff's process revealed that several cell phone numbers assigned the codes of "Bad Phone" and "Incorrect Number-Live Answer" were also associated with "a promise to pay or other record indicating the correct party was ever reached at that number." (Doc. #157-1, p. 9.) Although Biggerstaff removed those cell phone numbers from Group A, that removal demonstrates that the codes of "Bad Phone" and "Incorrect Number-Live Answer" do not establish that a wrong number was called. The Court finds Plaintiff's assertion that the remaining cell phone numbers in Group A belong to non-customers to be entirely speculative.

In addition, Plaintiff's contention that the Biggerstaff list is sufficient to establish numerosity because Defendants "fail[ed] to identify any person [on the Biggerstaff list] who is actually a customer" (Doc. #174, p. 13) is unavailing, as it is Plaintiff who "bears the burden of establishing every element of Rule 23";

it is not Defendants' duty to negate a presumption of numerosity. Vega, 564 F.3d at 1267.

The Court is similarly unpersuaded by Plaintiff's argument that Mr. Biggerstaff's list is sufficient to establish numerosity because of "Defendants' own testimony that the Bad Phone code was used to wrong numbers; i.e. calls made to a noncustomer." (Doc. #174, p. 13.) As discussed above, Van Nest testified that a BP Code may be assigned to a phone number for various reasons, many of which do not indicate that a non-customer or wrong number was called. Absent any evidence establishing how often a BP code is assigned to a number because the person reached was a non-customer, the Court can only speculate as to how many of the calls set forth in Group A were calls made to non-customers. The Court thus finds that Plaintiff has failed to satisfy Rule 23(a)(1)'s numerosity requirement.

### (2) Common Questions of Law or Fact (Commonality)

Plaintiff may utilize a class action suit "only if . . . there are questions of law or fact common to the class . . . ." Fed. R. Civ. P. 23(a)(2). To satisfy Rule 23(a)(2)'s commonality requirement, the class members' "claims must depend upon a common contention," and that common contention "must be of such a nature that it is capable of classwide resolution." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). This means "that determination of its truth or falsity will resolve an issue that

is central to the validity of each one of the claims in one stroke." Id.

Plaintiff asserts that this case presents overarching questions which are common to all members of the class:

> Here, class claims depend upon several common contentions that will be resolved on a class-wide basis "in one stroke" without the need for any individualized inquiries, including: (a) whether the phone calls were placed with the technology prohibited by the TCPA (i.e. an ATDS or prerecorded voice); (b) Defendant's policies and practices with respect to Bad Phone/Wrong Number codes; and (c) whether Defendant's violations of the TCPA were willful under § 227(b)(3).

(Doc. #157, p. 19.)

Defendants assert these issues do not present common questions because (1) Defendants "used separate systems to place those calls"; (2) "Plaintiff must prove that a pre-recorded voice actually played to establish liability, and there is no way to determine that in one stroke with respect to each class member"; (3) the BP Codes "were subjectively used in a vast array of circumstances and [] the BP Codes are inadmissible hearsay"; and (4) "whether Defendants acted in 'willful' violation of the TCPA . . . turns on the facts of each call." (Doc. #164, pp. 32-33.)

Here, the Court finds that whether Defendants placed phone calls using technology prohibited by the TCPA is "sufficient to satisfy the low hurdle of Rule 23(a)(2)." Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1356 (11th Cir. 2009). Although Defendants "used separate systems to place those calls," whether

they made such calls using TCPA-prohibited technology – either using an ATDS or prerecorded voice - is "of such a nature that it is capable of classwide resolution." Wal-Mart, 564 U.S. at 350. Further, that determination "will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." Id. at 350, 359 ("[F]or purposes of Rule 23(a)(2) [e]ven a single [common] question will do" (quotations and citations omitted)).[18]

**(3) Typicality**

Plaintiff may utilize a class action suit "only if: . . . (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class . . . ." Fed. R. Civ. P. 23(a)(3). "Class members' claims need not be identical to satisfy the typicality requirement; rather, there need only exist 'a sufficient nexus . . . between the legal claims of the named class representatives and those of individual class members to warrant class certification.'" Ault v. Walt Disney World Co., 692 F.3d

---

[18] The Court is unpersuaded by Defendants' assertion that commonality cannot be established because whether a prerecorded voice actually played cannot be determined "in one stroke with respect to each class member." This issue of ultimate liability under the TCPA is more appropriately discussed under the predominance analysis *infra*. See e.g. Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 623 (1997)("Even if Rule 23(a)'s commonality requirement may be satisfied . . . the predominance criterion is far more demanding." (citation omitted)).

1212, 1216 (11th Cir. 2012) (citing <u>Prado-Steiman v. Bush</u>, 221 F.3d 1266, 1278-79 (11th Cir. 2000)). "This nexus exists 'if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" <u>Ault</u>, 692 F.3d at 1216.

Plaintiff argues that the typicality requirement has been satisfied:

> In this case, Plaintiff was subjected to the same pattern or practice as every other class member—i.e. Defendants' use prohibited technology to place debt collection robocalls to cellular telephone numbers of non-customers even after Defendants' business records confirmed it called a wrong number. And Plaintiff's claim, like the claim of every other class member, is based on a single legal theory—i.e. that Defendants' conduct violated 47 U.S.C. §227(b)(1)(A)(iii).

(Doc. #157, p. 20.)

Defendants respond there are unique facts underlying Plaintiff's claim that preclude a finding of typicality. Specifically, Defendants argue that Customer H re-consented to receive calls at the 2025 Number on multiple occasions, placing Defendants in a Catch-22 position of removing a number its customer said was correct or following a non-customer's request to change a customer's account without authorization. Additionally, Defendants assert that Plaintiff is not even a member of his own purported classes under the procedure designed by his expert. (Doc. #164, pp.37-39.)

The Court disagrees with Defendants that Plaintiff is atypical of the proposed classes because Defendants' defenses are unique to Plaintiff and not applicable to the members of the proposed classes. Indeed, in their predominance analysis, Defendants argue that the same defenses they claim are unique to Plaintiff will also be applicable to other members of the proposed classes. For instance, although Defendants claim the issue of reconsent is unique to Plaintiff, Defendants also assert in the predominance analysis of their Response in Opposition that:

> BHN's records show that it received payments on the accounts identified in Group A suspiciously close in time after the appearance of a BP Code, indicating it was a customer who received the call and was then prompted to make a payment, not a third-party with no connection to the account. (BHN Decl. ¶ 30.) BHN's records also show that customers whose accounts were identified in Group A had other active accounts with BHN linked to the same phone number after the appearance of a BP Code meaning the customer (or user) gave BHN the same phone number after a BP Code occurred (when, e.g., opening a new account) and the BP Code did not evidence an actual "wrong number" call.[] (Id. ¶ 31.)

(Doc. #164, p. 24.) Similarly, as to Defendants' "unique" defense that Plaintiff is not even a member of his own proposed classes under the methodology provided by his expert, Defendants argue in their predominance argument that:

> Defendants have produced significant evidence that BP Codes do not prove a wrong number was called and thus that Plaintiffs proposed classes are filled with numerous consenting persons

(Id., p. 26.)

The Court thus finds no merit in Defendants' assertion that Plaintiff is atypical of the proposed classes because of the "unique" defenses applicable to his claims. And because the claims of Plaintiff and the proposed class members "arise from the same . . . pattern or practice and are based on the same legal theory," the Court finds Rule 23(a)(3)'s typicality requirement is satisfied. <u>Ault</u>, 692 F.3d at 1216 (quotation omitted).

**(4) Fair and Adequate Representation**

Plaintiff may utilize a class action suit "only if . . . (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This adequacy analysis involves two inquiries: "(1) whether any substantial conflicts of interest exist between the representatives and the class[,] and (2) whether the representatives will adequately prosecute the action." <u>Valley Drug Co. v. Geneva Pharm., Inc.</u>, 350 F.3d 1181, 1189 (11th Cir. 2003) (internal quotation marks omitted). "[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." <u>Id.</u> at 1189.

Additionally, class counsel must fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(g)(4). "This requirement, aimed at ensuring the rights of absent class members are vigorously protected, is not satisfied where class

counsel represents parties whose interests are fundamentally conflicted." W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co., 737 F. App'x. 457, 464 (11th Cir. 2018)(citations omitted).

### a. Adequacy of Plaintiff

Plaintiff asserts that he satisfies this requirement because:

> Plaintiff understands his duties as class representative and has no interests antagonistic to the class . . . has repeatedly rejected Defendants attempts to get him to sell out the class, has been in almost constant contact with his attorneys, sat for his deposition and participated in discovery, and traveled to Orlando for the mediation.

(Doc. #157, p. 21.) Defendants argue that Plaintiff does not know enough about the case to adequately represent the classes. (Doc. #164, pp. 36-37.) Defendants so reason because Plaintiff testified at deposition that he did not know (1) "how much he would likely receive if this case settled on an individual versus class basis"; (2) "that other persons could pursue their own TCPA claims if he settled"; (3) the procedural posture of this case; (4) "that the validity of the FCC Ruling on which his case depends had been challenged"; (5) "which of his claims were brought on an individual versus class basis" and what those claims entailed; and (6) "any of the reasons that he might be unsuccessful on his claims." (Doc. #164, pp. 36-37.)

Because "the issue of adequate class representation arises in a wide variety of contexts," neither the Eleventh Circuit nor the Supreme Court "has set forth standards for determining the adequacy

of class representatives." <u>London v. Wal-Mart Stores, Inc.</u>, 340 F.3d 1246, 1254 (11th Cir. 2003)(quotation and citation omitted). As a general matter, however, "adequate class representation [] does not require that the named plaintiffs demonstrate to any particular degree that individually they will pursue with vigor the legal claims of the class." <u>Kirkpatrick v. J.C. Bradford & Co.</u>, 827 F.2d 718, 727 (11th Cir. 1987). Nonetheless, a class representative cannot have "so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." <u>Id.</u>

Here, the Court finds Plaintiff to be an adequate class representative under Rule 23(a)(4). The Court is unpersuaded that Plaintiff's inadequacy is demonstrated by Plaintiff's testimony that (1) he was not aware of the amount of money damages he would receive if this case were settled individually as opposed to class-wide; and (2) he was not aware that the remaining class members could pursue their own TCPA claims if Plaintiff settled his claims individually. The Court finds this lack of knowledge has no impact on whether Plaintiff will adequately prosecute the action on behalf of the classes, as it relates to Plaintiff's knowledge of the class members' individual rights in the hypothetical scenario that Plaintiff settled this case on an individual basis.

Similarly, the Court is unpersuaded that Plaintiff's inadequacy to serve as class representative is demonstrated by his testimony that he was unaware of a recent FCC ruling and was unable to answer the vague question of "what's happened in the case so far?".[19] (Doc. #157-9, p. 18.) Further, although Plaintiff incorrectly testified at deposition that he brought his FCCPA claim on a class basis, Plaintiff also testified that he participated in discovery, spoke with his lawyers about the case "all the time," and that he "made a decision to [pursue] a class action suit . . . [to] help the little guy." (Doc. #157-9, pp. 20, 23, 25.) Plaintiff also attended mediation in this case. (Doc. #150-2, p. 4.) The Court thus finds Plaintiff is an adequate class representative, as Plaintiff's overall testimony and actions confirm that he does not have "so little knowledge of and involvement in the class action that [he] would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Kirkpatrick, 827 F.2d at 727.

### b. Adequacy of Counsel

Plaintiff also asserts that his counsel satisfies Rule 23(g)(4) because "counsel [has] extensive experience litigating

---

[19] At the time of Plaintiff's deposition on October 5, 2017, this case contained 100 docket entries.

TCPA claims and class actions under the TCPA." (Doc. #157, p. 21.) Defendants dispute this contention.

Defendants assert that "counsel are unethically controlling this litigation to protect their own financial interests to the detriment of Plaintiff and the class, rendering both counsel and Plaintiff inadequate and precluding certification." (Doc. #164, p. 33.) This includes the use of an engagement agreement that transforms a standard contingency fee agreement to a retroactive hourly fee agreement should Plaintiff settle or dismiss the case against counsel's advice:

> **Exception for Individual Settlement Agreement Against Attorneys' Advice:**
> If Client abandons the class and settles on an individual basis against the advice of Attorney, Client shall be obligated to pay Attorney their normal hourly rates [of up to $600 per hour] for the time they expended in the case, and shall be obligated to reimburse the Attorney for all expenses incurred.

(the "Settlement Restriction"). (Watstein Decl., Ex. 6 ("Corsmeier Report") at Ex. 6 at (Doc. #164, p. 34.) Defendants argue this violates Rules 4-1.2 and 4-1.5 of the Rules Regulating the Florida Bar, and that counsel cannot cure this deficiency by revising the engagement agreement since harm has already occurred. For instance, Defendants assert Plaintiff did not learn of a $30,000 settlement offer until after his attorney rejected it and the offer expired. (Doc. #164, pp. 34-37.) Defendants thus argue that counsel is incapable of fairly and adequately representing the classes as required by Rule 23(g)(4).

The fact that counsel violates rules of professional conduct or otherwise engages in unethical behavior in litigating a class action "does not require[] [a court] to find [counsel] inadequate to represent the class." Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1323 (11th Cir. 2008). This is so because where "class counsel [] act[s] improperly, [t]he ordinary remedy is disciplinary action against the lawyer and remedial notice to class members, not denial of class certification." Id. at 1324 (citation and quotation omitted); Reliable Money Order, Inc. v. McKnight Sales Co., 704 F.3d 489, 498 (7th Cir. 2013)(Class counsel's ethical misconduct does not necessarily "justif[y] the grave option of denying class certification." (citations omitted)).

However, "[m]isconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification." Creative Montessori Learning Centers v. Ashford Gear LLC, 662 F.3d 913, 918 (7th Cir. 2011)(citation omitted).[20] "Serious doubt" exists when class counsel's misconduct "prejudices the class or creates a direct

---

[20] Given the lack of Supreme Court or Eleventh Circuit authority establishing when counsel's unethical behavior warrants denial of class certification, district courts in this Circuit have applied the standard set forth by the Seventh Circuit Court of Appeals. See Powell v. YouFit Health Clubs LLC, No. 17-CV-62328, 2019 WL 926131, at *3 (S.D. Fla. Jan. 14, 2019); Keim v. ADF MidAtlantic, LLC, 328 F.R.D. 668, 689 (S.D. Fla. 2018).

conflict between counsel and the class." Reliable Money Order,
704 F.3d at 498. Unethical conduct that is "not necessarily
prejudicial to the class" may nonetheless warrant denial of class
certification when the misconduct jeopardizes the court's ability
to reach a just and proper outcome in the case." Id. at 499. For
example, "counsel's attempts to bribe potential witnesses" or
counsel's "fail[ure] to correct a witness's false deposition
testimony despite knowing its falsity" warrants denial of class
certification, despite such misconduct not being prejudicial to
the class. Id. (citations omitted).

Here, as to counsel's alleged failure to inform Plaintiff of
Defendants' settlement offer, while Plaintiff testified he
believed he received the settlement offer from his counsel after
September 6, 2017 (after the offer had expired), Plaintiff also
testified that he was generally unsure of when he received the
offer in the mail because a hurricane had impacted Florida at that
time and "the mailboxes went down." (Doc. #157-9, p. 28.)
Plaintiff also testified that he rejected Defendants' settlement
offer "[a]fter [counsel] called [him]." (Doc. #157-9, p. 27.)
Further, Defendants' evidence demonstrates that Plaintiff's
counsel spoke with Plaintiff on the phone shortly after receiving
Defendants' settlement offer; Defendants contend that counsel
informed Plaintiff of Defendants' settlement offer on this call.
Defendants' evidence also establishes that, after the phone call

with Plaintiff, counsel sent an email to co-counsel, stating, "Just talk [sic] to client. He gave us permission to turn down." (Doc. #150-2, p. 21.)

The Court disagrees with Defendants that the evidence in this case establishes that Plaintiff's counsel failed to inform Plaintiff of Defendants' settlement offer. Certainly, Plaintiff's counsel's phone and email records do not definitively establish that counsel informed Plaintiff of Defendants' settlement offer. However, such evidence, coupled with Plaintiff's uncertain testimony and assertion that he rejected Defendants' settlement offer after speaking with counsel creates an ambiguity as to whether counsel did in fact inform Plaintiff of Defendants' settlement offer. Thus, on this record, the Court cannot conclude that counsel's conduct with respect to Defendants' settlement offer "creates a serious doubt that counsel will represent the class loyally . . . ." Ashford, 662 F.3d at 918.

As to the allegedly unethical fee agreement, a similar provision was found to violate "the Alaska Rules of Professional Conduct and other provisions of Alaska law." Compton v. Kittleson, 171 P.3d 172, 180 (Alaska 2007). And given that the fee agreement served as a financial disincentive for Plaintiff to settle this case against the recommendation of counsel, such a fee agreement may similarly violate Rule 4-1.5(a) of the Rules Regulating the Florida Bar, which prohibits a lawyer from charging

a "clearly excessive fee or cost." Ultimately, however, the Court
need not make that determination, as Plaintiff's counsel has
removed the provision in an amended fee agreement. (Doc. #174-
7.) Because the current fee agreement does not contain the
allegedly unethical retroactive hourly fee provision, the Court
cannot conclude that the previous fee agreement prejudices the
proposed classes or "jeopardizes the court's ability to reach a
just and proper outcome in th[is] case." Reliable Money Order,
704 F.3d at 499.

The Court recognizes that the previous fee agreement may have
prejudiced Plaintiff *individually* by preventing him from accepting
Defendants' settlement offer on an individual basis. However, it
is for the Florida Bar – not this Court – to enforce the Rules
Regulating the Florida Bar and determine whether disciplinary
action is appropriate. See id. ("[S]tate bar authorities—not a
court—should enforce the rules and sanction the attorney.");
Busby, 513 F.3d at 1324 (Where "class counsel [] act[s] improperly,
[t]he ordinary remedy is disciplinary action against the
lawyer.").

For the foregoing reasons, the Court finds that counsel's
allegedly unethical conduct does not warrant denial of class
certification in this case. Further, the Court finds no conflict
of interest between Plaintiff's counsel and members of the proposed
classes, and Plaintiff's counsel's affidavits (Docs. ## 150-2,

150-4,) demonstrate they have extensive experience in litigating TCPA class action lawsuits. The Court thus finds Plaintiff's counsel to be adequate under Rule 23(g)(4).

## D.    **Express Rule 23(b)(3) Requirements**

If the requirements of Rule 23(a) are satisfied, a class action may be maintained in this case under Rule 23(b)(3) if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3). The parties dispute whether these requirements have been satisfied.

### (1)   **Predominance Requirement**

As the Eleventh Circuit has stated:

> To determine whether the requirement of predominance is satisfied, a district court must first identify the parties' claims and defenses and their elements. The district court should then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial. Common questions are ones where the same evidence will suffice for each member, and individual questions are ones where the evidence will var[y] from member to member.
>
> After identifying the common and individual questions, the district court should determine whether the common questions predominate over the individual ones. We have adopted the following rule of thumb: [I]f common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.... If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively

undisturbed, then common issues are likely to predominate. But predominance requires a qualitative assessment too; it is not bean counting," and the "relative importance" of the common versus individual questions also matters. District courts should assess predominance with its overarching purpose in mind— namely, ensuring that a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

Brown v. Electrolux Home Products, Inc., 817 F.3d 1225, 1234-35 (11th Cir. 2016)(internal citations and punctuation omitted); see also Carriuolo v. Gen. Motors Co., 823 F.3d 977, 985 (11th Cir. 2016).

Plaintiff identifies the following common questions of law or fact which he asserts will predominate over any individualized issues: whether (1) an automatic telephone dialing system or prerecorded voice technology was used; (2) Defendants' actions were willful; (3) Defendants had prior express consent; (4) Defendants called the class members after Defendants had designated their phone numbers as a wrong number; and (5) Defendants willfully violated the TCPA. (Doc. #157, pp. 24-25.)

Defendants argue that individual issues will predominate, including the issue of consent. (Doc. #164, pp. 22-32.) Specifically, Defendants argue individual issues will predominate because (1) consent can only be determined on an individual basis, as all of the phone numbers in Group A were provided to Bright House by Bright House customers; (2) non-customer users of Bright

House's services may be bound by the arbitration provision in Bright House's RSAs; (3) as to the PRV class, individualized inquiries will be required to determine if a PRV played; (4) individualized inquiries will be required to determine whether each class member has standing; and (5) individualized inquiries will be required to apportion damages. (Doc. #164, pp. 22-32.)

Plaintiff, however, asserts that individual issues will not predominate because (1) "Plaintiff narrowly tailored the class to exclude persons that may have consented; (2) the class only includes members who were called after their number was assigned a BP code, which "establish[es] that [Defendants] lacked consent to call[] these telephone numbers"; (3) the arbitration provision in Bright House's RSAs only apply to account holders; (4) as to the PRV class, Defendants admit their records establish when a PRV should have played; (5) it is well established in the Eleventh Circuit that "a subscriber to a telephone number has standing in a TCPA claim based on the mere physical connection of a telephone call to his telephone number, which invades the subscriber's property interest by occupying the telephone line"; and (5) individualized inquires will not be required in determining damages because "the class is limited to subscribers only, so [damages] is not an issue at all." (Doc. #174, pp. 7-12.)

Here, the Court agrees with Defendants that individual issues will predominate in this case. While the overarching legal claims

are the same for each putative plaintiff (e.g. whether Defendants called the class members in violation of the TCPA) resolution of these common legal claims will "break[] down into an unmanageable variety of individual legal and factual issues." Babineau, 576 F.3d at 1191. For instance, as to the issue of consent, the Court would be required to make individual determinations as to whether each class member consented to receive calls from Defendants. The fact that the classes are limited to non-customers whose phone numbers were assigned a BP code does not prevent these individualized inquiries, as Defendants' evidence demonstrates that a non-customer may consent to receive calls on behalf of a customer.

Plaintiff, however, contends that such individualized issues of consent are unlikely to predominate because "there is no reason to believe any significant percentage" of non-customers consented to receive calls on behalf of a Bright House customer. (Doc. #174, p. 8.) Plaintiff so reasons because, in order to establish such consent by intermediary, "Defendants would have to prove that the customer actually obtained the class members' consent to have Defendants call about the customer's debt, and that the customer then conveyed that consent to Defendants." (Id.)

While Plaintiff has accurately outlined the contours of the doctrine of intermediary consent, and although it appears Defendants have submitted no evidence indicating that a non-

subscriber consented to receive debt collection calls on a subscriber's behalf under this doctrine, a party may also establish consent pursuant to the TCPA under agency law principles. See Osorio, 746 F.3d at 1253 (noting that the plaintiff's consent to receive debt-collection phone calls on behalf of his housemate under the TCPA could be established where the plaintiff and his housemate shared an agency relationship). Given that the phone numbers at issue in this case were provided to Bright House by Bright House customers (Doc. #165-1, p. 4), and because Bright House provided services to households (often with multiple service users within a household), the Court finds that whether non-customers consented to receive such calls under agency law principles can only be resolved on a case-by-case basis. Indeed, Defendants have submitted evidence demonstrating that Bright House customers often prefer to be called at a non-customer's phone (such as a spouse or family member's phone). (Doc. #165-1, p. 4.)

Relatedly, determining whether Defendants called a class member after designating that number as a "wrong number" will require a case-by-case analysis of the facts. As discussed in the commonality analysis *supra*, a BP code does not necessarily establish that Defendants called a wrong number, and resolution of this issue can therefore only be resolved through individualized

inquiries as to why each call was assigned a BP Code.[21]  Indeed, Bright House's affidavit reflects that it received payments on past-due accounts associated with cell phone numbers in Group A "shortly after a bad phone code appeared in ATS's call logs" and that customers "had other (including *new*) accounts with the same phone number that were active *after* the presence of a bad phone code . . . ."  (Doc. #165-1, p. 8)(emphasis in original.) Determining whether these BP Codes indicated a wrong number was called can only be resolved on an individual basis, and Defendants' imprecise record keeping does not preclude the required individualized inquiries.  See Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 356 (3d Cir. 2013)("[T]he nature or thoroughness of a defendant's recordkeeping does not alter the plaintiff's burden to fulfill Rule 23's requirements.").

Moreover, Bright House's RSA contains an arbitration provision which provides that Bright House may compel arbitration for any dispute "regarding any aspect of [the customer's]

---

[21] Similarly, as to the PRV class, determining whether a PRV played would require an individualized inquiry as to each PRV class member.  The Court is unpersuaded by Plaintiff's assertion that this issue is unlikely to predominate because Defendants' records demonstrate when a PRV "should have played" on a call.  (Doc. #174, p. 12.)  While these records may be probative evidence as to this issue, whether a PRV "should have played" does not establish that it did in fact play.  See e.g. Ybarra v. Dish Network, L.L.C., 807 F.3d 635, 640 (5th Cir. 2015)("To be liable under the 'artificial or prerecorded voice' section of the TCPA . . . [the] artificial or prerecorded voice must actually play.").

relationship with [Bright House]." (Doc. #165-1, p. 3.) The RSA further provides that the use of Bright House's services "by any person other than [the customer] is also subject to the terms of [the RSA]."[22] (Id.) Although Plaintiff's proposed classes are limited to non-customers, these non-customers may ultimately be bound by the arbitration provision within the RSA because Bright House provided services to households with non-customer users of Bright House's services. See Raffa Assocs., Inc. v. Boca Raton Resort & Club, 616 So. 2d 1096, 1097 (Fla. 4th DCA 1993)(noting that under Florida law, "ordinarily a third-party beneficiary of a contract is bound by an arbitration clause in that contract" (citations omitted)); Akpele v. Pac. Life Ins. Co., 646 F. App'x 908, 912 (11th Cir. 2016)("[S]tate contract law informs whether arbitration agreements are binding on third-party beneficiaries."). The Court thus finds that resolving whether the arbitration clause in the RSA applies to non-customer users of Bright House's services will require significant individualized inquiries.[23]

---

[22] From 2011 through 2015, Bright House used different versions of its RSA. However, all of the versions used during this time period appear to contain this same provision, as well as the same arbitration clause. (Doc. #165-1, pp. 13, 35, 59, 72.)

[23] The Court, however, finds no merit in Defendants' assertion that the issue of damages would predominate because "it appears that *both* a subscriber and customary user of the same number would be members of the classes" and the Court would thus have to determine how to apportion damages between the two (Doc. #164, p. 31). See Osorio, 746 F.3d at 1251-52(The "called party" under the

For the foregoing reasons, "the issue of liability . . . turn[s] upon highly individualized facts." <u>Williams v. Mohawk Indus., Inc.</u>, 568 F.3d 1350, 1357 (11th Cir. 2009)(citations and quotation omitted).  The Court thus finds that Plaintiff has failed to satisfy Rule 23(b)(3)'s predominance requirement.

**(2)  Superiority of Class Action**

Rule 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  A court considers the following factors in making this superiority determination:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

---

TCPA means the subscriber to the cellphone service, not the intended recipient of the call."  Similarly, the Court finds no merit in Defendants' assertion that the issue of standing will predominate because "a subscriber who falls within the class may nonetheless lack standing to pursue a TCPA claim because he never used the phone number and never even knew ATS made the allegedly offending call." (Doc. #164, p. 31.)  <u>See e.g.</u> <u>Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.</u>, 781 F.3d 1245, 1250 (11th Cir. 2015)(To establish TCPA standing, "the specific injury . . . is the sending of the fax and resulting occupation of the recipient's telephone line and fax machine, not that the fax was actually printed or read.").

Fed. R. Civ. P. 23(b)(3).

Plaintiff asserts that a class action is a superior method of resolving this controversy because "requiring individual class members to file their own suits would deter some from enforcing their rights because the recoverable statutory damages" are minimal, ranging from $500 to $1500 per call that violates the TCPA. (Doc. #157, pp. 25-26.) In response, Defendants assert that a class action is not a superior method of fairly and efficiently adjudicating the controversy, but simply makes the litigation impossibly overly-complex given the multiple individual issues. (Doc. #164, pp. 39-41.) Defendants also contend that "the statutory damages of $500 to $1,500 per call are more than sufficient to incentivize plaintiffs to bring individual TCPA claims." (Id., p. 40.)

A court's "predominance analysis has a tremendous impact on [its] superiority analysis . . . ." Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1184 (11th Cir. 2010)(citation and quotation omitted). Thus, "the less common the issues, the less desirable a class action will be as a vehicle for resolving them." Id. This is because "a class action containing numerous uncommon issues may quickly become unmanageable." Id.

Here, given the lack of predominance discussed *supra*, the Court finds a class action is not superior to other available

methods of fairly and efficiently adjudicating this controversy. Id. ("[T]he lack of predominance belies any suggestion that a *fair* administration of the class claims could save[] the resources of both the court[] and the parties." (emphasis in original)(citation and quotation omitted)).  Further, the Court disagrees with Plaintiff that the statutory damages available to each class member are so minimal that individual class members would be deterred from filing individual TCPA actions.  As Plaintiff concedes, the average recovery for individual class members in this case would range from $2,500 to $7,500.  (Doc. #174, p. 16.)  The Court finds that such a recovery is not so minimal that it would deter the class members from filing individual TCPA actions.  See e.g. Quainoo v. City of Huntsville, Ala., 611 F. App'x 953, 955 (11th Cir. 2015)("[A] total of $4,000 in damages . . . far exceed[s] the damages amount ordinarily thought to be 'nominal.'" (citation omitted)).[24]  The Court thus concludes Plaintiff has failed to establish superiority under Rule 23(b)(3).

For the foregoing reasons, the Court finds Plaintiff has failed satisfy Rule 23's requirements.  Plaintiff's Motion for Class Certification is therefore denied.[25]

---

[24] The fact that the TCPA does not provide for attorney's fees does not alter this analysis, as "[t]he general rule in [the American] legal system is that each party must pay its own attorney's fees and expenses."  Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 550 (2010)(citation omitted).

[25] Defendants have filed a Motion to Exclude Plaintiff's

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1.    Plaintiff's Motion for Class Certification (Doc. #157) is **DENIED.**

2.     Plaintiff's Motion for Class Certification (Doc. #152) is **terminated as duplicative.**

3.    Defendants' Motion to Exclude (Doc. #195) is **DENIED.**

4.    Defendants' Motion to Exclude (Doc. #191) is **terminated as duplicative.**

**DONE and ORDERED** at Fort Myers, Florida, this ___27th___ day of September, 2019.

_____

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record

---

Expert Report of Robert Biggerstaff (Doc. #195), in which Defendants seek to exclude Biggerstaff's report from the Court's analysis of Plaintiff's Motion for Class Certification. Because the Court has denied Plaintiff's Motion for Class Certification without relying on Biggerstaff's conclusions, the motion to exclude is also denied.